**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO.  21-CR-436 (CRC)** |
| **v.** | |
| **CARLOS HUMBERTO HENRIQUEZ GOMEZ,** | |
| **Defendant.** | |

**GOVERNMENT'S POST-HEARING BRIEF**
**AND SENTENCING MEMORANDUM**

The United States of America, by and through its undersigned counsel, respectfully submits this sentencing memorandum in advance of the sentencing of Carlos Humberto Henriquez Gomez (the "Defendant"), which is scheduled for August 14, 2025, at 10:00 a.m. For the reasons set forth herein, the Government requests that this Court sentence the Defendant to 360 months of imprisonment, five years of supervised release, and a mandatory $100 special assessment. The recommended sentence is the low end of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range as calculated by the Government, which is 360 months' to life imprisonment.

## I.    BACKGROUND

### A.    Procedural History

On June 28, 2021, a federal grand jury sitting in  the District of Columbia returned a two-count Indictment charging the Defendant with (1) conspiracy to distribute five kilograms or more of cocaine on board an aircraft registered in the United States, in violation of 21 U.S.C. §§ 959(c)(1), 960(b)(1)(B)(ii), 963, and 18 U.S.C. § 2 (Count One); and (2) distribution of five

kilograms or more of cocaine on board an aircraft registered in the United States, in violation of 21 U.S.C. §§ 959(c)(1), 960(b)(1)(B)(ii), and 18 U.S.C. § 2 (Count Two).[1]

On September 11, 2022, while attempting to unlawfully enter the United States, the Defendant was arrested by U.S. Customs and Border Protection, U.S. Border Patrol at or near Eagle Pass, Texas, and charged in the U.S. District Court for the Western District of Texas with illegal reentry. *United States v. Henriquez-Gomez*, 2:22-cr-2250-MVL (W.D. Tex., Apr. 12, 2023). After he pleaded guilty and received a sentence of time-served in that case, the Defendant made his initial appearance in the instant matter in the U.S. District Court for the Western District of Texas and waived removal to Washington, D.C., on April 20, 2023. He arrived in the District of Columbia on June 6, 2023, for an initial appearance and arraignment.

The Defendant's trial was scheduled to commence on January 6, 2025. ECF 62. On December 17, 2024, the Defendant filed a Notice of Intent to Enter a Plea of Guilty, ECF No. 82, and on December 19, 2024, the Defendant entered a guilty plea to the Indictment without a plea agreement, ECF No. 82. On April 29, 2025, the Court presided over a pre-sentencing evidentiary hearing, during which the Government presented evidence and testimony of two witnesses, Chris Lane and Jay Borns, both Special Agents of the Drug Enforcement Administration ("DEA"), that showed that the Defendant is not entitled to a mitigating role adjustment under U.S.S.G. § 3B1.2.

**B.   The Government's Evidence of the Defendant's Average, Not Mitigating, Role**

From in or around September 2018 until September 2019, in Venezuela, Belize, Mexico, the United States, and elsewhere, the Defendant conspired to distribute tonnage quantities of cocaine on board a U.S.-Registered Aircraft. *See* Tr. of Apr. 29, 2025, Evid. Hr'g ("Evid. Hr'g

---

[1] On December 3, 2024, the Government filed a Motion to Amend Indictment, ECF No. 80, which the Court orally granted on December 11, 2024, at the pre-trial conference.

Tr.") at 48-50. In or around December 2018, the Defendant, along with co-conspirator David Noe Orellana Discua ("Orellana Discua"), traveled from Honduras to Belize, where they first met with co-conspirator Norlan Carrasco Lopez ("Carrasco Lopez") and a confidential human source ("CHS") known as "AT" or "Toro," who was working on behalf of the DEA and the Belize Police Department ("BPD") Anti-Narcotics Unit ("ANU"). *See* Gov't Evid. Hr'g Ex. ("Gov't Ex.") 12 (CHS debrief, Dec. 11, 2018); Evid. Hr'g Tr. at 15-17. Among drug traffickers, the CHS was known for his ability to coordinate private aircraft flights delivering large shipments of cocaine from South America into Belize. Evid. Hr'g Tr. at 19:3-20:4. Drug traffickers also sought out the CHS for his access to corrupt officials within the Belize law enforcement community. Evid. Hr'g Tr. at 19:5-10. The CHS could facilitate: (1) freedom of movement throughout Belize; (2) safe passage through vehicle checkpoints; and (3) the payment of bribes to corrupt local police to ensure safe landing of drug-laden aircraft without interference. Evid. Hr'g Tr. at 19:11-25, 20:1-4.

On December 8, 2018, the CHS and Carrasco Lopez escorted the Defendant and Orellana Discua to a clandestine airstrip off Coastal Road in La Democracia, Belize, to survey the airstrip for suitability for the landing of a narcotics-laden aircraft. *See* Gov't Ex.12; Evid. Hr'g Tr. at 21:7-9, 22:6-25. According to the CHS, the Defendant's responsibility was to "check" the length and surface of the runway to make sure it was suitable for small aircraft to land. Evid. Hr'g Tr. at 22:17-18, 25:12-24, 40:25-41:4.[2] *See* Photograph 1 from Gov't Ex. 12 (depicting from left to

---

[2] The Government has no evidence that Defendant has any specialized training or experience that would qualify him to "check" the runway. Nonetheless, in a debriefing of the CHS conducted by Country Attache ("CA") Loretta Moore (Gov't Ex. 12), the CHS described the Defendant as the "*checker* of the airstrip." Though the testifying witnesses acknowledged that "checker" is not a recognized term of art, in this context, its meaning is understood to reference someone whose responsibility is to confirm the length and surface of the runway is suitable for the type of aircraft contemplated. Evid. Hr'g Tr. at 51:12-53:6.

right, Carrasco Lopez, the Defendant (indicated by the yellow box), and Orellana Discua); *see also* Evid Hr'g Tr. at 23:13-14.



*Photograph 1: Surveillance photograph taken in December 2018*

From December 2018 through September 2019, the Defendant attended approximately three to four meetings with two co-conspirators in San Pedro Sula, Honduras, where the co-conspirators discussed the following: (1) receiving flights in Belize; (2) the difficulty of recruiting pilots; and (3) the backlog of shipments awaiting transport. Evid. Hr'g Tr. at 56:2-23. A Colombian national, believed by "Witness 1"[3] to be the person sending the "merchandise" from Colombia, also attended some of these meetings. Evid. Hr'g Tr. at 56:20-23. On at least one occasion, the Defendant dropped Orellana Discua off at a meeting, left to run errands for him, and then returned to pick up Orellana Discua at the conclusion of the meeting. Evid. Hr'g Tr. at 56:5-19.

---

[3] "Witness 1" was one of the Defendant's co-conspirators who later cooperated with the Government and was debriefed multiple times. Witness 1 did not testify at the evidentiary hearing, but portions of his or her statements were introduced through SA Lane. *See* Evid Hr'g Tr. at 53:7-58:21.

On September 7, 2019, the Defendant, along with multiple co-conspirators, again traveled from Honduras to Belize. *See* Evid. Hr'g Tr. at 26:8-11; Gov't Ex. 13 (ANU surveillance report, Sept. 7, 2019). They met with the CHS and his associates at a designated link-up point and traveled to the same clandestine airstrip they had visited in December 2018 in preparation for the planned arrival of a drug-laden aircraft. Evid. Hr'g Tr. 26-28, 30:19-23; *see also* Gov't Ex. 13. Specifically, they traveled out to the airstrip to confirm the grid coordinates for the pilots transporting the shipment. *See* Evid. Hr'g Tr. at 26:4-11, 57:2-7, 70:25-71:6, 89:19-90:4. BPD ANU officers, in an undercover capacity, conducted surveillance under the guise of providing security for the CHS at this meeting, reinforcing the illusion that the CHS controlled local law enforcement. Evid. Hr'g Tr. at 19:19-20:4; Gov't Ex. 2 (photograph taken by BPD ANU officers during surveillance); Gov't Ex. 13 (ANU surveillance report, September 7, 2019).



*Photograph 2: Surveillance photograph taken on September 7, 2019; Defendant indicated by yellow box*

On the night of September 8, 2019, the Defendant, along with multiple co-conspirators, placed lights along the clandestine airstrip for the purpose of illuminating the runway for the aircraft's landing. Evid. Hr'g Tr. at 80:22-81:1, 97:12-21. The Defendant and his co-conspirators

were aware that this incoming aircraft contained a large amount of cocaine. Evid. Hr'g Tr. at 77:13-78:9, 97:22-25.

At approximately 12:06 a.m., on September 9, 2019, a Beechcraft King Air 200, U.S.-registered aircraft landed at the clandestine airstrip at Coastal Road in Democracia, Belize. Evid. Hr'g Tr. at 31:5-34:12, 49:1-8. The Defendant and his co-conspirators began to unload bales of cocaine from the aircraft into their vehicle. Evid. Hr'g Tr. at 57:17-25-58:1-5, 81:18-25. According to Witness 1, when they had difficulty removing the bales that were secured by ropes, the Defendant produced a knife to cut the ropes and facilitate the offload. Evid. Hr'g Tr. at 57:14-58:5. Witness 1 also stated that the Defendant was part of the "assembly line" that formed to unload the bales of cocaine from the aircraft. *Id.*

BPD ANU and the Belize Defense Force ("BDF") then intercepted the group while the Defendant and his co-conspirators were loading bales of cocaine into one of the vehicles from the aircraft. Evid. Hr'g Tr. at 31:7-33:8. The Defendant and his co-conspirators fled, leaving the aircraft and the vehicle, both of which contained bales of cocaine, at the scene. Evid. Hr'g Tr. at 36:5-13; *see also* Gov't Exs. 5-8 (crime scene photographs depicting seized cocaine bales).



*Photograph 3 from Gov't Ex. 7: Crime scene photograph taken on September 9, 2019; Defendant
indicated by yellow box*

Belizean authorities detained and then arrested the Defendant and his co-conspirators; the
BPD recovered 16 bales containing 470 block parcels of cocaine from the vehicle and an additional
25 bales containing 736 block parcels of cocaine from the aircraft, for a total of 1,341.34 kilograms
of cocaine. Evid. Hr'g Tr. at 35:11-38:24; Gov't Exs. 18-19 (controlled substance analysis reports).

Following the interdiction, BPD recovered a global positioning system ("GPS") device
from the cockpit of the aircraft. Evid. Hr'g Tr. at 49:9-50:4. A BPD Cybercrime Forensics
Technician examined the GPS and determined that the aircraft traveled from Mexico to Venezuela
where it was loaded with its illicit cargo before returning north to Central America and arriving in
Belize after midnight on September 9, 2019. *Id*.; *see also* Gov't Ex. 11 (GPS exploit, flight patch
overview).

The Defendant testified on his own behalf during the evidentiary hearing. Evid. Hr'g Tr.
at 72-104. Significantly, the Defendant denied that he had traveled to Belize in December 2018,
despite a surveillance photograph proving otherwise. Evid. Hr'g Tr. at 79:5-20. Instead, the
Defendant claimed that the picture taken on the airstrip and included in a DEA report prepared in
December 2018 was somehow taken nearly a year later, the day before the arrival of the aircraft
in September 2019.[4] The Defendant pointed towards the similarity of the shirt that Orellana Discua
is wearing in each of the photos as his only support for the claim. Evid. Hr'g Tr. at 83:8-13;

---

[4] This was not the only testimony that the Defendant offered that is inconsistent with the other
evidence: Notably, the Defendant testified during his direct examination that he was arrested for
conspiracy to harbor illegal aliens but stated that he was not convicted. Evid. Hr'g Tr. at 73:9-12,
100:23-101:7. When confronted with the fact that the Probation Office's Presentence Investigation
Report included information regarding his conviction after a guilty plea and sentence of
incarceration for conspiracy to commit hostage taking in the District of Arizona in 2003, the
Defendant denied having pled guilty and claimed he was instead one of the hostages. Evid. Hr'g
Tr. at 100:23-101:19. *See* Exhibit A, separately filed under seal.

*compare* Gov't Ex. 1 *with* Gov't Ex. 7. The Defendant testified that he visited the airstrip only once, in September 2019, directly contradicting his Notice of Intent to Enter a Plea of Guilty, in which he admitted that he traveled to the clandestine airstrip on two separate dates. *Compare* ECF No. 82 at 7, ¶ 8, *with* Evid. Hr'g Tr. at 93:7-12, 90:16-91:19.

He admitted driving Orellana Discua to Belize, a 16-hour trip by car, the day before the event. Evid. Hr'g Tr. at 76:6-78:3. The Defendant explained that he drove Orellana Discua, who did not have a license, to Belize, and he believed that Orellana Discua was going to purchase a boat in Belize. *Id*. The Defendant gave inconsistent testimony about when he first learned that the true purpose of the September 2019 trip was to receive a substantial quantity of cocaine arriving via aircraft at a clandestine airstrip. The Defendant initially testified that he was already halfway to Belize when Orellana Discua told him the true purpose of the trip was to go to a landing strip to receive a plane carrying drugs. Evid. Hr'g Tr. at 78:4-9. But he later testified that he only learned that the arriving plane was carrying cocaine as he was marking a remote runway in the middle of the night. Evid. Hr'g Tr. at 97:24-25. The Defendant admitted to being at the airstrip and to placing "three lights" on the runway but denied any other participation. Evid. Hr'g Tr. at 80:22-81:1, 97:14-21. He denied being part of the "assembly line" and denied producing a knife to cut the ropes securing the cocaine bales inside the plane. Evid. Hr'g Tr. at 96:14-24, 97:9-11.

### C. **Statutory Penalties**

Following the pre-sentencing evidentiary hearing, on August 4, 2025, the U.S. Probation Office issued its final Presentence Investigation Report ("PSR"). ECF No. 101. The PSR correctly sets forth the statutory penalties applicable to the Defendant. On each count, the Probation Office acknowledged that the Defendant faces a mandatory minimum sentence of ten years of imprisonment, a maximum sentence of life imprisonment, a fine up to $10,000,000, and a term of

supervised release of at least five years. ECF No. 101 at ¶¶ 92-96, 111. [5] Additionally, on each count, the Defendant is subject to a special assessment of $100. *Id.* at ¶ 112. The Defendant is ineligible for relief under the safety valve provision under 18 U.S.C. § 3553(f) because he has a prior three-point offense, *see id.* at ¶ 37. *See* 18 U.S.C. § 3553(f)(1)(B); U.S.S.G. § 5C1.2(a)(1)(B).

## II.    THE DEFENDANT'S SENTENCING GUIDELINES RANGE

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007) (citation omitted). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46 (citation omitted).

Here, for the reasons discussed below, the Court should find that the Defendant's Sentencing Guidelines range is 360 months to life imprisonment, based on a total offense level of 40 and a Criminal History Category of III. The Defendant is not entitled to a two-level acceptance-of-responsibility reduction, nor does his conduct warrant a two-level mitigating role adjustment.

### A.  The Defendant's Sentencing Guidelines Range Is 360 Months to Life Imprisonment

The Probation Office correctly calculated the Defendant's base offense level at 38 after concluding that that the Defendant is responsible for 450 kilograms or more of cocaine, pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1). [6] ECF No. 101 at ¶ 26. The Probation Office also correctly

---

[5] The Defendant, in his Notice of Intent to Enter a Plea of Guilty, acknowledged the application of the same statutory penalties set forth in the PSR. *See* ECF No. 82 at 2-3, ¶ 3.

[6] Since the Defendant pleaded guilty to the Indictment, without a plea agreement, the parties did not agree to the Guidelines sentencing calculation. However, the Defendant, in his Notice of Intent to Enter a Plea of Guilty, acknowledged that Defendant's base offense level is 38, pursuant to

applied a two-level increase because the Defendant unlawfully imported or exported under circumstances in which an aircraft, other than a regularly scheduled commercial air carrier, was used to import or export the cocaine, pursuant to U.S.S.G. § 2D1.1(b)(3).[7] *Id.* at ¶ 27. This two-level increase calculated by the Probation Office prompted an adjusted offense level of 40. *Id.* at ¶ 31. The Probation Office also correctly stated that the Defendant is ineligible for a two-level reduction under the zero-point offender adjustment provision pursuant to U.S.S.G. § 4C1.1. *Id.* at ¶ 34.[8] The Probation Office correctly calculated Defendant's criminal history as Category III.[9] *Id.* at ¶¶ 37-39. The Probation Office also recommended, however, a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a), resulting, in the Probation Office's calculations, in a total offense level of 38 for a Guidelines range of 292 to 365 months' imprisonment based on the Defendant's Criminal History Category of III. *Id.* at ¶¶ 33, 35, 93.[10]

The Government objects to the Probation Office's application of a two-level reduction to the Defendant's Guidelines offense level for acceptance of responsibility under U.S.S.G.

---

U.S.S.G. § 2D1.1(c)(1) because the amount of cocaine attributable to the Defendant was 450 kilograms or more. ECF No. 82 at ¶ 5.a.

[7] The Defendant also acknowledged that he was subject to a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(3) for use of an aircraft other than a regularly scheduled commercial carrier. ECF No. 82 at ¶ 5.b.

[8] The Defendant, in his Notice of Intent to Enter a Plea of Guilty, acknowledged that he is not eligible for a two-level reduction in the offense level under the zero-point offender provision pursuant to U.S.S.G. § 4C1.1. ECF No. 82 at 6, ¶ 5.d

[9] The Defendant also acknowledged that he was fell within Criminal History Category III. ECF No. 82 at ¶ 5.f.

[10] The Probation Office correctly did not apply a one-level reduction pursuant to U.S.S.G. § 3E1.1(b). The Defendant is not entitled to a one-level reduction pursuant to U.S.S.G. § 3E1.1(b) because he pleaded guilty after the parties last pre-trial conference and shortly before the commencement of a two-week jury trial and the Government had expended significant resources in preparation for trial.

§ 3E1.1(a) because, in seeking a mitigating role reduction under U.S.S.G. § 3B1.2, the Defendant falsely minimizes his role in the charged conspiracy. *See* ECF No. 101 at ¶ 24.

Section 3E1.1 of the Guidelines provides for a two-level offense level reduction "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1. A "defendant who enters a guilty plea is not entitled to an adjustment . . . as a matter of right." *United States v. Saani*, 650 F.3d 761, 767 (D.C. Cir. 2011) (quotation omitted). The defendant bears the burden of demonstrating that he is entitled to this downward adjustment, and a "favorable recommendation of the probation officer does not relieve him of the burden." *United States v. McLean*, 951 F.2d 1300, 1302 (D.C. Cir. 1991).

The Defendant must accept responsibility not just for the elements of the offense, but for all relevant conduct to that offense. *See United States v. Leyva*, 916 F.3d 14, 28 (D.C. Cir. 2019) (citation and internal quotation marks omitted) ("It is not error for a district court to require an acceptance of responsibility that extended beyond the narrow elements of the offense to all of the circumstances surrounding the defendant's offense."). Indeed, the application notes to § 3E1.1 notes that "[a] defendant who falsely denies . . . relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1, app. n. 1(A). In *Leyva,* the defendant denied that he was one of the leaders of his drug trafficking organization and challenged the application of a leadership sentencing enhancement under U.S.S.G. § 3B1.1(a). The district court (1) applied the sentencing enhancement because there was evidence supporting the conclusion that the defendant held a leadership role, and (2) concluded that the defendant did not qualify for a downward adjustment for acceptance of responsibility because he falsely minimized his role in the conspiracy. *Leyva*, 916 F.3d at 20-21, 28. The D.C. Circuit upheld the district court's denial of adjustment for acceptance of responsibility, because it

reasoned that the defendant "cannot accept responsibility for his conduct and simultaneously contest the sufficiency of the evidence that he engaged in the conduct." *Id.* at 28-29.

As discussed below, just like the defendant in *Levya*, the Defendant has falsely minimized his role in the conspiracy by arguing that he played a mitigating role in the conspiracy that warrants a reduction in his Guidelines offense level. The overwhelming evidence in this case demonstrates that, at minimum, the Defendant was an average participant in the conspiracy. This inconsistent and deliberate minimization of his role in the conspiracy negates the concept of accepting responsibility. As such, the Defendant does not warrant an acceptance-of-responsibility adjustment. The Court should find that the Defendant's total offense level is 40, resulting in a Guidelines range of 360 months to life imprisonment given his Criminal History Category III.

## B.  The Defendant Does Not Qualify for a Mitigating Role Adjustment

The Defendant objects to the Probation Office's determination that he is not entitled to a mitigating role adjustment pursuant to U.S.S.G. § 3B1.2(a). *See* ECF No. 101 at ¶¶ 16, 29; *see also id*. at ¶ 25. The Defendant contends that he had a minimal role in the criminal activity and seeks a four-level reduction in his offense level under U.S.S.G. § 3B1.2(a). *Id.* at 2. Relatedly, the Defendant objects to factual statements contained in the PSR's Offense Conduct section, specifically, PSR ¶¶ 6, 8, 9, 13, and 16, relating to his involvement in the charged conspiracy before September 2019, his membership in a drug trafficking organization, his travel to Belize in December 2018, and his role in offloading narcotics from the plane, maintaining his assertion that his only role was to place lights on the runway. *Id.* at ¶¶ 24-25.

The Defendant has not and cannot offer any credible evidence to refute the veracity of the substantial evidence the Government presented at the evidentiary hearing regarding his role as, at minimum, an average participant in the offense, evidence that is supported by the Statement of

Facts accompanying the Defendant's guilty plea and included in the PSR. The Court should overrule the Defendant's objection to the PSR and decline to apply any mitigating role adjustment under U.S.S.G. § 3B1.2 in calculating the Defendant's Guidelines offense level.

1. Legal Standard

The Defendant bears the burden of proving by a preponderance of the evidence that he is entitled to a mitigating role adjustment. *See United States v. Burke,* 888 F.2d 862, 869 n.10 (D.C. Cir. 1989) ("The defendant properly bears the burden of proof under those sections of the Guidelines that define mitigating factors.") (citation omitted); *United States v. Keleta*, 552 F.3d 861, 866 (D.C. Cir. 2009) ("[T]he government bears the burden of proof in seeking sentencing enhancements under the Guidelines, but the defendant bears the burden in seeking sentencing reductions."); U.S.S.G. § 6A1.3, comment (preponderance of the evidence); *see also United States v. Watts*, 519 U.S. 148, 156 (1997) (per curiam) (same).

Section 3B1.2 enumerates three mitigating role adjustments: (1) a four-level downward adjustment for minimal participants; (2) a two-level downward adjustment for minor participants, (3) and a three-level adjustment for defendants whose conduct falls in between a minimal and minor participant. U.S.S.G. § 3B1.2. Whether a defendant is entitled to an adjustment under any of these subsections is a fact-intensive determination that takes into account various factors, including "the degree to which the defendant understood the scope and structure of the criminal activity;" "the degree to which the defendant participated in planning or organizing the criminal activity;" and "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts[.]" U.S.S.G. § 3B1.2 app. n. 3(C).

A minimal participant is "plainly among the least culpable of those involved in the conduct of a group," whereas a minor participant is a defendant "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 app. n. 4, 5.  A minimal participant lacks knowledge of the "scope and structure of the enterprise and of the activities of others." U.S.S.G. § 3B1.2 app. n. 4; *see also United States v. Foster*, 988 F.2d 206, 209 (D.C. Cir. 1993) (defendant's "apparent knowledge of their criminal activity and the great amount of cocaine involved" made him ineligible for a mitigating role adjustment).[11] And when a defendant knows of a conspiracy's purpose and takes an active role in furthering it, he is not a minor participant. *See, e.g.*, *United States v. Mejia*, 597 F.3d 1329, 1343 (D.C. Cir. 2010) (affirming the district court's rejection of a minor role reduction to defendant who was fully knowledgeable and aware of the drug importation conspiracy, took three trips to El Salvador to further the conspiracy, and served as a security function for the conspirators); *United States v. Ortiz-Santiago*, 211 F.3d 146, 149 (1st Cir. 2000) (affirming district court decision in denying the minor role downward adjustment for defendant who "had unloaded a sizable drug shipment and had conducted surveillance as a member of the conspiracy and that this participation, while peripheral in a sense, was enough to warrant categorizing him as a player rather than as a dabbler"); *United States v. Davis*, 938 F.2d 744, 747 (7th Cir. 1991) (affirming denial of a mitigating role adjustment where defendant was more than a minor participant and was considered

---

[11] S*ee also United States v. Camargo-Vergara*, 57 F.3d 993, 998, 1000 (11th Cir. 1995) (denying minimal role reduction because the defendant actively and knowingly furthered the cocaine distribution conspiracy; noting that in earlier decisions the court recognized that knowledge may be established with "highly probative circumstantial evidence" such as assisting to "off-load the cocaine from airplanes" or by "extensive interaction with coconspirators and presence at hiding places for the imported contraband"); *United States v. Martinez*, 763 F.2d 1297, 1303 (11th Cir. 1985) ("evidence presented established appellants' participation in a carefully orchestrated and timed off-loading operation, revealing conduct by appellants that belies their protestations of innocent intent and lack of knowledge.")

as a "full participant" because he was present during key discussions, aided in planning, unloaded truck contents, and had some level of knowledge of the illicit scheme).[12]

### 2.  The Defendant Does Not Qualify for a Mitigating Role Reduction

The Defendant does not qualify for any reduction in his offense level under § 3B1.2. He was not a minor or minimal participant, or anything in between.

To start, the Defendant's on-the-scene participation in a drug trafficking event involving over 1,300 kilograms (1.3 tons) of cocaine is alone enough to disqualify him from any mitigating role adjustment under § 3B1.2. The Defendant admitted to knowing that the arriving aircraft was delivering cocaine, and that authorities seized more than 1,300 kilograms of cocaine. *See* ECF No. 82 at 8; *see also* Evid. Hr'g Tr. 85:2-5, 93:13-15. Courts around the country have recognized that the quantity of drugs attributed to a defendant may render him ineligible for a four-level minimal participant adjustment under U.S.S.G. § 3B1.2(a). *See, e.g., Ortiz-Santiago*, 211 F.3d at 147, 149 (defendant not entitled to minimal participant reduction because he had "on-the-scene involvement in two large-scale" drug smuggling events involving approximately 50 to 150 kilograms of cocaine) (citations omitted); *see also United States v. Akintomide*, 185 F. Supp. 2d 1, 8 (D.D.C. 2001) ("the amount of drugs that the defendant transported prevents him from obtaining a downward adjustment as a minimal participant.").[13] Courts also have recognized that a defendant's

---

[12] *See also United States v. Gregg,* 47 Fed. App'x 1, 4 (D.C. Cir. 2002) (per curiam) (affirming denial of minor role adjustment for a defendant who "played a significant role at various times" and acted as a "middleman" between the main organization and street customers, despite not being part of the "inner circle"); *United States v. Gaviria*, 116 F.3d 1498, 1519-20 (D.C. Cir 1997) (per curiam) (affirming denial of minor role adjustment for defendant who had conversations with the undercover agent leading up to the controlled drug transaction and was entrusted to accept money on behalf of the owner of the drugs).

[13] *See also United States v. Webster*, 996 F.2d 209, 212 n.5 (9th Cir. 1993) (per curiam) (reasoning that a district court's finding that defendant carried a substantial amount of drugs would foreclose a minimal participant downward adjustment) (citation omitted)*; United States v. Rojas*, 868 F.2d

involvement in the transport, distribution, and importation of large quantities of drugs may foreclose application of a two-level minor role downward adjustment. *See, e.g., United States v. Cuero-Sinisterra*, 198 Fed. Appx. 874, 875-76 (11th Cir. 2006) (per curiam) (finding no error in the denial of minor role adjustment to a defendant who was involved in smuggling 269 bales of cocaine; noting that the district courts properly weighed the substantial drug quantity in rejecting a role reduction, despite the defendant's absence of a proprietary interest in the cocaine and self-proclaimed lack of awareness of the overall conspiracy scheme); *United States v. Rodriguez-Castro*, 641 F.3d 1189, 1193 (9th Cir. 2011) (affirming denial of a minor role adjustment due to defendant's planning efforts in making several trips across the border and the importation of 33.46 kilograms of cocaine was deemed substantial and would not likely be entrusted to a minor player).[14]

If the sheer volume of cocaine the Defendant played a direct role in transporting for importation into the United States were not enough, however, his conduct and involvement in critical stages of the conspiracy render him ineligible for any adjustment under U.S.S.G.

---

1409, 1409-10 (5th Cir. 1989) (497 grams of cocaine was considered too substantial to warrant a mitigating role reduction).

[14] *See also United States v. Galindo-Perez*, 322 Fed. Appx. 743, 745 (11th Cir. 2009) (per curiam) (affirming denial of minor role adjustment noting that "in the drug courier context, a large amount of drugs is an important factor in determining the availability of a minor role reduction[,]" where the amount was 720 kilograms of cocaine); *United States v. Rodriguez De Varon*, 175 F.3d 930, 945-46 (11th Cir. 1999) (en banc) (affirming, on rehearing, denial of minor role adjustment for defendant who was involved in one instance of serving as an internal body carrier of "512.4 grams of 85 percent pure heroin from Colombia into the United States"); *United States v. Carrazco*, 91 F.3d 65, 67 (8th Cir. 1996) (recognizing that when a defendant is "apprehended in possession of a very substantial amount of drugs," that is "a circumstance that tends to suggest that his participation in the criminal enterprise was itself very substantial[.]"); *cf. Webster*, 996 F.2d at 212 n.5 (stating that "[a]lthough the amount of contraband may be relevant to whether a defendant is a minor participant …we have never held possession of a large amount of drugs necessarily forecloses the availability of a minor participant adjustment.") (internal citation omitted).

§ 3B1.2(a). The evidence shows that the Defendant had an active and important role in the conspiracy, with knowledge of the scope of the enterprise and the activities of others and is equally as culpable as many of his co-conspirators. Thus, like the defendants in *Meija, Ortiz-Santiago,* and *Davis*, the Defendant is not entitled to a mitigating role adjustment because he knew and understood the scope and purpose of the conspiracy and was present at various critical stages of the conspiracy and resulting distribution of a substantial amount of cocaine.

The Defendant personally traveled twice from his home country to Belize, driving a co-conspirator for a sixteen-hour one-way drive, to further the conspiracy, like the defendant in *Mejia*, who traveled three times to El Salvador. As discussed in detail above, the Defendant first traveled in December 2018 from Honduras to a clandestine airstrip in Belize to meet with his co-conspirators and a CHS to survey the airstrip for suitability and feasibility of a narcotics-laden aircraft arrival—approximately ten months prior to the arrival of the cocaine-laden N40RA on September 9, 2019. Evid. Hr'g Tr. at 21:7-9, 22:6-25. The airstrip was not an official airstrip utilized by commercial or private aircraft; rather, it was a covert airstrip without a proper runway, lighting, and air traffic control tower. *See* Evid. Hr'g Tr. at 88:13-20. The Defendant's responsibility was to "check" the length and surface of the runway to make sure it was suitable for small aircraft to land. Evid. Hr'g Tr. at 22:17-18, 25:12-24, 40:25-41:4. Defendant thus served a critical role in ensuring the success of the conspiracy: without surveying the suitability of the land and surrounding area, any aircraft landing on this clandestine airstrip would not have been feasible. The Defendant's assertion now that he was not present at this meeting directly contradicts the Government's contemporaneous evidence otherwise, and the Court should not credit it. *Compare* Evid. Hr'g Tr. at 91:10-19 *with* Gov't Ex. 12 (CHS debrief, Dec. 11, 2018, including Gov't Ex. 1 as an embedded photo).

The Government also presented evidence, and the Defendant admitted, that he attended preparatory meetings with other co-conspirators in Honduras where they discussed issues related to the transport of cocaine before September 2019. Evid. Hr'g Tr. at 98:5-99:7. Then, on September 7, 2019, by the Defendant's own admission, the Defendant traveled from Honduras, driving Orellana Discua in a 16-hour car trip, to the clandestine airstrip in Belize on September 7, 2019, where the two met with other co-conspirators. Evid. Hr'g Tr. at 76:16-78:25; ECF No. 82 at 7 ("On September 7, 2019, the Defendant, along with multiple co-conspirators, traveled from Honduras to Belize, arriving at a clandestine airstrip in La Democracia, Belize, to prepare for the planned arrival of a cocaine-laden aircraft.").[15] This time, the Defendant and co-conspirators, accompanied by the CHS, took another critical step in securing the feasibility of the plane landing—obtaining grid coordinates of the airstrip to provide to the pilots. Evid. Hr'g Tr. at 56:24-57:7. Without obtaining grid coordinates of the airstrip, the pilots of the cocaine-laden aircraft could not land at the correct destination.

The next evening, on September 8, 2019, the Defendant and his co-conspirators, accompanied by the CHS, arrived again at the same clandestine airstrip. This time, the Defendant and co-conspirators prepared the airstrip for the arrival of the cocaine shipment aboard N40RA. The Defendant admits to arriving at the clandestine airstrip on the evening of September 8, 2019, to mark the airstrip by manually placing lights on the ground to illuminate an informal path for the aircraft. Evid Hr'g Tr. 80:22-81:1; 97:12-98:21; ECF No. 82 at 7 (admitting "[o]n the night of September 8, 2019, the Defendant, along with multiple co-conspirators, placed lights along the airstrip for the purpose of illuminating the runway for the aircraft's landing"). The placement of

---

[15] The Defendant seemingly attempted to walk back this admission in his hearing testimony, insisting that he first went to the airstrip in the morning before the arrival of the aircraft. *See* Evid. Hr'g Tr. 79-80.

lights to illuminate a path for the cocaine-laden aircraft was an important task. Without placing such lights on the ground, the pilots of the cocaine-laden aircraft would have extreme difficulty landing at the airstrip in the middle of the night. The Defendant remained at the airstrip through the morning hours of September 9, 2019, with the intention to offload bales of cocaine from the aircraft into a pickup truck. ECF No. 82. at 8 (admitting to remaining at the airstrip to receive the cocaine). Once the cocaine-laden aircraft arrived on the illuminated clandestine airstrip, the Defendant and his co-conspirators began offloading the bales of cocaine into the waiting pickup truck before they were ultimately apprehended by BPD. Evid. Hr'g Tr. at 57:14-58:5. When they could not remove the ropes binding the cocaine bales, the Defendant produced a knife to cut the ropes.[16] *Id.*

In sum, the Defendant was involved throughout the scope of the conspiracy with knowledge of the activities of others and an active and important role in facilitating the efforts to successfully complete the conspiracy's objective. He participated in various planning meetings in Honduras and traveled twice from Honduras to Belize to visit the clandestine airstrip three times, working with his co-conspirators to survey the airstrip, obtain grid coordinates of the airstrip, manually illuminate an informal runway, and offload the cocaine bales from the aircraft. He, therefore, was more than a minor participant, so, by default, he cannot qualify as a minimal

---

[16] The Defendant has objected to the Probation Office's finding that he personally offloaded bales from the aircraft, ECF No. 101 at 25, and, at the evidentiary hearing, denied participating in the assembly line, Evid. Hr'g Tr. at 96:14-97:11. These assertions are inconsistent with the evidence the Government introduced at the evidentiary hearing that SA Lane learned from debriefings of Witness 1. Evid. Hr'g Tr. at 57:17-58:5. The Government submits that the Court should credit this evidence from the Defendant's co-conspirator and not the Defendant's self-interested assertions. But even if the Defendant did not participate in the offload of cocaine, the Defendant's other activities serve as sufficient evidence to render him at least an average participant.

participant or any kind of participant in between. He should not receive any mitigating role adjustment.

### III.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

After correctly calculating the advisory Guidelines range, this Court must consider the factors set out in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49–50. Some of the factors this Court must consider include: (1) the nature and circumstances of the offense, section 3553(a)(1); (2) the history and characteristics of the defendant, *id.*; (3) the need for the sentence to reflect the seriousness of the offense and promote respect for the law, section 3553(a)(2)(A); (4) the need for the sentence to afford adequate deterrence, section 3553(a)(2)(B)–(C); and (5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, section 3553(a)(6). In this case, as described below, all the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

#### A.  Nature and Circumstances of the Offense

The nature and circumstances of the Defendant's crime weigh heavily towards a significant term of incarceration. The Defendant's conviction arises out of his participation in a DTO that, on at least one occasion, arranged for the transportation of a substantial quantity of cocaine from Venezuela to Belize by a U.S.-registered aircraft. The Defendant is personally responsible for trafficking more than 1,300 kilograms of cocaine, which is equivalent to more than 1.3 tons of cocaine, on just a single occasion.

As discussed in detail above, the Defendant was present for the initial survey and assessment of the clandestine airstrip. The Defendant was responsible for checking the suitability of the runway, both its length and surface, for example, for specific types of aircraft. The Defendant accompanied his co-conspirators when they later returned to confirm grid coordinates just one day

prior to the anticipated arrival of the drug-laden aircraft. The Defendant was present during the activities to prepare and mark the runway with lights for the night-time arrival of the aircraft, and then he assisted his co-conspirators as they began offloading more than 1.3 tons of cocaine that arrived aboard the aircraft just after midnight on September 9, 2019. Accordingly, the Defendant's conduct compels a significant sentence because he was involved in critical steps leading up to and continuing through the date the aircraft arrived in Belize with a staggering payload of cocaine.

## B.  The History and Characteristics of the Defendant

The Defendant's history and characteristics also warrants a significant sentence. The Defendant's history shows that he was not born into crime, but the presence of multiple early childhood stressors likely contributed to his decision to engage in criminal activities. ECF No 101 at ¶¶ 46-57. The Defendant "didn't really have a childhood," explaining that he began working around 7 or 8 years old. *Id.* at ¶ 53. He was raised by his mother and stepfather, who he reports physically and emotionally abusing him, and only first met his biological father at age 25. *Id.* at ¶¶ 51-52. At age 15, he enlisted in the Honduran army after his mother kicked him out of the family home. *Id.* at ¶¶ 54-57. The Defendant had some high school education and served in the Honduran army for at least five years.[17] His employment history following his enlistment appears to be filled with significant, unexplained gaps. *Id.* at ¶¶ 82-87.

The Defendant illegally entered the United States in at least three known instances. *See* ECF No. 101 at ¶¶ 38, 41-42. Most recently, he was arrested in the Western District of Texas on September 11, 2022, and subsequently convicted for illegal reentry into the United States. Following his sentencing to a period of time-served on April 12, 2023, he was returned on the

---

[17] *See* ECF No. 101 at ¶¶ 76, 78, 80-81 (noting some inconsistencies between the Defendant's current reporting and the 2004 PSR relating to years of military service).

arrest warrant in the instant matter. *Id.* at ¶ 38. The Probation Office assessed this conviction as adding two points to his overall criminal history score.

The Defendant also has a previous conviction from 2003. On August 13, 2003, the Defendant pleaded guilty in the U.S. District Court for the District of Arizona, to one count of conspiracy to commit hostage taking and one count of conspiracy to harbor illegal aliens. *Id.* at ¶ 37. On October 27, 2004, he was sentenced to a period of 36 months' incarceration. *Id*. As described in detail by the Probation Office, the facts of the case are particularly egregious. *Id*. The Defendant was one of five individuals who unlawfully detained, at gunpoint, twenty illegal immigrants in a Phoenix, Arizona, apartment for nearly 30 days. *Id*. The victims had been brought to United States by alien smugglers, and upon their arrival at the Phoenix apartment, were forced to contact family members or friends to arrange payment of the smuggling fee to secure their release. *Id*. The Defendant was described by the victim-hostages as "the smuggler who treated the aliens the worst:" they reported that he always carried a semi-automatic pistol in his waistband, that he was verbally and physically abusive, and that he at times would "play with the handgun and threateningly" hold the gun to their heads. *Id*. Significantly, when questioned by police officers, the Defendant misled the officers and claimed to be a victim of the hostage-taking and denied the use or possession of firearms by the captors. *Id*. The Probation Office assessed this conviction as adding three points to his overall criminal history score. When asked about his criminal history at the evidentiary hearing, he denied that he had pled guilty to this offense or had been sentenced to a term of imprisonment for it and again asserted that he was one of the hostages. Evid. Hr'g Tr. at 102:5-8.

The Defendant's past criminal conduct, and his blatant lie about it under oath in this case, demonstrates his complete disregard for the law, including the laws of the United States. The

Defendant's efforts to mislead investigators in 2003, and this Court at the hearing, by painting himself as one of the victims and denying the use or presence of firearms is consistent with his effort to falsely minimize his role in this case, and inconsistent with acceptance of responsibility for the offenses.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

Congress has gone to great lengths to send the message to drug traffickers that the United States will not tolerate the importation and trafficking of illicit drugs in the United States. This message was first codified in the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236 (Oct. 27, 1970). Title III of the Act—referred to as the Controlled Substances Import and Export Act of 1970—adopted strict regulatory requirements for importation and exportation of controlled substances. *Id.* at §§ 1000-1016 (codified at 21 U.S.C. §§ 951-971). It also criminalized the manufacture and distribution of a controlled substance "intending" or "knowing" that the controlled substance would be unlawfully imported into the United States. *Id.* at § 1009 (codified at 21 U.S.C. § 959). Here, Congress sought to eradicate the international drug trade insofar as the illicit substances were bound for the United States.

Congress did not stop there. In 1989, Congress amended Section 959 to create a new criminal prohibition that reached the international drug trade. It criminalized the use of aircraft registered in the United States to distribute controlled substances. *See* Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 3161, 100 Stat. 3207-94, 95 (Oct. 27, 1986). With this amendment, the message was louder and stronger—the United States will not tolerate drug traffickers' efforts to capitalize on their criminal activities by using U.S.-registered planes to move their illicit substances, regardless of whether the drugs are bound for the United States.

The Defendant was part of a conspiracy that involved more than 1.3 tons of cocaine trafficked from South America to Central America aboard a U.S.-registered aircraft. He worked with others to survey a suitable clandestine airstrip in Belize where the DTO could receive drug-laden aircraft, nearly a year before the plane bearing the cocaine landed at the airstrip, and he participated in the marking of the clandestine runway and the offload of the delivered cocaine for further distribution. The method of distribution falls squarely into a category of conduct that Congress prohibited. A sentence of 360 months reflects the seriousness of the offense and will promote respect for the law. A lesser sentence would suggest to the public, in general, and other drug traffickers, specifically, that attempts to use U.S.-registered aircraft to move and distribute controlled substances are not taken seriously. In this way, a lesser sentence could encourage further efforts. *See Gall,* 552 U.S. at 54 (recognizing that the Government's concern "that a lenient sentence for a serious offense threatens to promote disrespect for the law" was legitimate).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B)–(C), *United States v. Jackson*, 848 F.3d 460, 466-67 (D.C. Cir. 2017) (citation omitted).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The international drug trade has many components—growers, producers, couriers, suppliers, brokers, and dealers, to name a few. To profit from this illicit trade, drug traffickers must move the illicit drug—in this case cocaine—from the country in which it is produced to other parts of the world where demand is high. Most of the cocaine distributed

throughout the world is produced in Colombia, and traffickers go to great lengths to move cocaine out of Colombia to nearby countries, including Belize and Venezuela, where there is greater access to open waterways and airspace conducive to moving large quantities of cocaine to other countries. Therefore, the need to deter others is especially strong in cases involving the use of U.S.-registered aircraft to siphon cocaine out of Colombia and into other countries for distribution and eventual importation into the United States.

Given the adverse societal and community impacts of drug trafficking, it is important that the Court impose a sentence that will deter others from engaging in this activity. A significant sentence in this case will send a clear message to other similarly situated players in the drug trafficking world—that regardless of role, punishment is certain. While this prosecution disrupted some fraction of narcotics trafficking using U.S-registered aircraft, continued drug trafficking plainly still occurs on a massive scale. The recommended sentence will deter other narcotics traffickers by demonstrating that such activities result in substantial periods of incarceration.

### *Specific Deterrence*

The Defendant's actions demonstrate the need for a lengthy sentence to specific deterrence. The Defendant joined a conspiracy whose sole purpose was to transport massive amounts of cocaine by private aircraft to Belize for ultimate importation into the United States. The Defendant's persistent involvement in coordinating the critical and successful transport of a massive shipment of cocaine by a U.S.-registered aircraft demonstrates the need to deter him from resuming his criminal activities upon release. Also, as discussed above, the Defendant has not adequately accepted responsibility for his offense conduct in this case, and he continues to minimize serious crimes that he committed in the past, demonstrating that a lengthy sentence is necessary here to deter him from future crimes.

### E.  Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—"the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct"—the statute requires a specific evaluation of the compared defendants' records and conduct. When determining whether a sentence creates an *unwarranted* disparity, the Court should also consider, *inter alia*, a defendant's acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, a defendant's criminal history, and whether and to what extent a defendant cooperated. *See, e.g., Mejia*, 597 F.3d at 1344 (concluding that difference in sentences was "entirely explained" by co-defendant's acceptance of responsibility and thus any disparity resulting from defendant's "harsher" sentence was not unwarranted) (citation omitted). A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

As set forth in detail above, the Defendant was a member of a DTO that in this single instance, conspired to receive more than 1.3 tons of cocaine, transported aboard a U.S.-registered aircraft from Venezuela to Belize. ECF No. 101 at ¶ 8-9. The Defendant admitted responsibility for the distribution of at least 450 kilograms of cocaine aboard a U.S. registered aircraft— triggering the highest base offense level under the Guidelines. *See* ECF No. 82 at 8.

While the average and median sentences provided in the PSR are helpful, they do not capture at least three important aspects of this case: (1) the Defendant's trafficking of at least 450 kilograms of cocaine and specifically over 1.3 tons of cocaine; (2) an alarming criminal history based on a long history of offenses against the United States that is captured in the Guidelines calculation, resulting in a criminal history category of III; and (3) his false minimization of his role

in the offense by seeking a mitigating role adjustment, and consequently his denial of responsibility for the offense conduct. These distinguishing factors bridge the gap between the PSR's identified average and median sentences of 285 months of imprisonment for cases involving mainly cocaine, a final offense level of 38, and Criminal History Category III, and the Government's recommended sentence of 360 months' imprisonment. ECF No. 101 at ¶ 122. Moreover, the Government has identified two cases, based on the defendants' conduct, Guidelines range, criminal history, extent of cooperation, acceptance of responsibility, and resulting sentence, that demonstrate that the Government's recommended sentence will not create an unwarranted sentencing disparity.

### 1. _Defendant A_[18]

Defendant A pled guilty to conspiracy to distribute cocaine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B)(ii), and 963. Defendant A was a Mexico-based cocaine broker and investor. Defendant A knew that the conspiracy involved tonnage quantities of cocaine, agreed to receive a 1,250-kilogram cocaine shipment in Mexico for further distribution, and ultimately was held accountable for 3,100 kilograms of cocaine.

Defendant A's base offense level was 38. Defendant A received a four-level leadership role enhancement, and a three-level reduction for acceptance of responsibility. Defendant A had no known criminal history. Following these adjustments, Defendant A's total offense level was 39, with a Guidelines range of 262 to 327 months' imprisonment. Defendant A received a 300-

---

[18] Due to sealing, references to Defendant A have been anonymized. The Government will provide that defendant's name and case number to the Court _ex parte_ upon request.

month sentence. He did not receive any credit at sentencing for providing substantial assistance to the government.

While it is true that the Defendant did not receive a leadership adjustment, unlike Defendant A, the nature of the charged conspiracy for both defendants is similar, and the Defendant' prior criminal history results, by the Sentencing Guidelines' design, in a higher Guidelines range for those like the Defendant who have a long history of offenses against the United States. Considering these comparisons, the Government's recommended 360-month sentence would not create an unwarranted sentencing disparity as compared to Defendant A.

## 2. *Gabriel Cerda-Guillen*[19]

Gabriel Cerda-Guillen ("Cerda-Guillen") pled guilty to a conspiracy to distribute and possess with intent to distribute methamphetamine and marijuana, in violation of 21 U.S.C. §§ 841(a), 84l(b)(l), and 846. For over a year, Cerda-Guillen was a member of a drug trafficking organization that operated within the United States and Mexico. Cerda-Guillen was a methamphetamine producer and distributor, responsible for approximately 22 to 44 kilograms of methamphetamine. Cerda-Guillen concealed within other objects approximately 10 kilograms of methamphetamine and 1,000 kilograms of marijuana for shipment. Cerda-Guillen also pled guilty to a separate count of money laundering conspiracy.

Cerda-Guillen's base offense level was 38. Cerda-Guillen received a two-level role enhancement, and another two-level enhancement for the money laundering conviction under 18 U.S.C. § 1956. Cerda-Guillen had no known criminal history. After a three-level reduction for timely acceptance of responsibility, Cerda-Guillen's total offense level was 39, with a Guidelines

---

[19] 8:16CR366-RFR-MDN, (D. Neb. May 24, 2024).

range of 262 to 327 months' imprisonment. Cerda-Guillen was sentenced to 262 months of imprisonment on the drug conspiracy charge alone.

Despite differences in the underlying conduct, Defendant and Cerda-Guillen have closely similar Guidelines ranges and recommended sentences. The Defendant is responsible for a higher aggregate drug quantity compared to Cerda-Guillen. *See, e.g.*, U.S.S.G. § 2D1.1 cmt. n.8(D) (providing drug conversion tables and noting a higher converted drug weight for cocaine and methamphetamine than for marijuana). Moreover, Defendant is entitled to a two-level increase due to the use of aircraft, as noted above, and he has a much higher criminal history category than Cerda-Guillen. Unlike the Defendant, Cerda-Guillen was given and entitled to full credit for timely acceptance of responsibility. Therefore, Defendant's conduct warrants the higher, recommended 360-month sentence in comparison to Cerda-Guillen's sentence.

### 3. **Edgar Fabian Villasenor-Garcia**[20]

Edgar Fabian Villasenor-Garcia pled guilty to conspiracy to distribute five kilograms or more of cocaine and 500 grams or more of methamphetamine, intending, knowing, and having reasonable cause to believe that those substances would be unlawfully imported into the United States in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(H), 963, and 18 U.S.C. § 2. For over five years, Villasenor-Garcia was an armed member of a prolific and violent drug trafficking cartel in Mexico, the Cartel de Jalisco Nueva Generation ("CJNG"). He helped CJNG distribute large quantities of cocaine and methamphetamine destined for the United States. Villasenor-Garcia was

---

[20] 1:21-CR-480 (BAH), (D.D.C. Feb. 21, 2025).

responsible for distributing at least 450 kilograms of cocaine and at least 780 kilograms of methamphetamine.

Villasenor-Garcia's base offense level was 38. Villasenor-Garcia received a two-level role enhancement for possession of a firearm and another two-level enhancement for importation of methamphetamine. Villasenor-Garcia had no known criminal history in the United States. After a three-level reduction for timely acceptance of responsibility, Villasenor-Garcia's total offense level was 39, with a Guidelines range of 262 to 327 months' imprisonment. Villasenor-Garcia was sentenced to 250 months of imprisonment.

Despite the differences in the underlying conduct, the Defendant and Villasenor-Garcia have closely similar Guidelines ranges and recommended sentences. While Villasenor-Garcia personally distributed at least 5 kilograms of methamphetamine per week from 2017 to 2019 and at least 0.5 kilograms of cocaine per week from 2017 to 2018, the Defendant is responsible for a 1,341-kilogram load of cocaine. While it is true that the Defendant did not receive a leadership adjustment or a two-level methamphetamine enhancement like Villasenor-Garcia, the Defendant did receive a two-level enhancement for the use of an aircraft in the offense. Moreover, the Defendant has a much higher criminal history category than Villasenor-Garcia and, unlike the Defendant, Villasenor-Garcia was given and entitled to full credit for timely acceptance of responsibility. Therefore, the Defendant's conduct warrants the higher recommended 360-month sentence in comparison to Villasenor-Garcia's sentence and would not create an unwarranted sentencing disparity as compared to Villasenor-Garcia.

## IV.    CONCLUSION

For the reasons set forth above, the Government recommends that the Court sentence the Defendant to 360 months of imprisonment, five years of supervised release, and a mandatory $100

special assessment for each Count, to run concurrently.

Respectfully Submitted,


Dated: August 7, 2025                    MARLON COBAR, Chief
                                         Narcotic and Dangerous Drugs Section
                                         Criminal Division
                                         U.S. Department of Justice


                              By:    */s/ Douglas Meisel*
                                     Douglas Meisel
                                     Trial Attorney
                                     Narcotic and Dangerous Drugs Section
                                     Criminal Division
                                     U.S. Department of Justice
                                     145 N. St. N.E.
                                     Washington D.C. 20530
                                     Telephone: 202-598-2281
                                     Email: douglas.meisel@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the Government's Post-Hearing Brief and Sentencing Memorandum was served to defense counsel on August 7, 2025, via CM/ECF.

By:     <u>*/s/ Douglas Meisel*</u>
Douglas Meisel
Trial Attorney
Criminal Division
United States Department of Justice
Narcotic and Dangerous Drug Section